UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 2189

------------------------------------------------------------x   Case No.

MELVINA L. GOREN,

**COMPLAINT**

                      Plaintiff,

-against-

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

THE MOUNT SINAI HOSPITAL,
VADESA GUZMAN, *Individually,*
NISHA SULLIVAN, *Individually,* and
JOHN HART, *Individually,*

                      Defendants.

------------------------------------------------------------X

Plaintiff, MELVINA L. GOREN, by her attorneys, PHILLIPS & ASSOCIATES,

Attorneys at Law, PLLC, hereby complains of the Defendants, upon information and belief, as

follows:

### NATURE OF THE CASE

1.     Plaintiff complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified, 42

U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of

1991, Pub. L. No. 102-166 ("Title VII"), and the <u>New York City Human Rights Law,</u>

New York City Administrative Code § 8-502(a), *et. seq.,* and seeks damages to redress

the injuries she has suffered as a result of being **Sexually Harassed**, **Discriminated**

**Against on the basis of Gender (Female)**, and **Retaliated Against** by her employer.

### JURISDICTION AND VENUE

2.     Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3), and 28 U.S.C. §§

1331 and 1343.

3.     The Court has supplemental jurisdiction over the claims of Plaintiff brought under state

law pursuant to 28 U.S.C. §1367.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) based upon Defendants' principal place of business within the Southern District of New York.

## PROCEDURAL PREREQUISITES

5. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

6. Plaintiff received a Notice of Right to Sue from the EEOC, dated March 15, 2013, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7. This Action is being commenced within ninety (90) days of receipt of said Right to Sue.

## PARTIES

8. That at all times relevant hereto, Plaintiff MELVINA L. GOREN ("GOREN") was a resident of the State of New York and the County of Kings.

9. That at all times relevant hereto, Defendant THE MOUNT SINAI HOSPITAL ("MOUNT SINAI") was a domestic not-for-profit corporation, duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at One Gustave L. Levy Place, 1190 Fifth Avenue, New York, NY 10029.

10. That at all times relevant hereto, Plaintiff GOREN was an employee of Defendant MOUNT SINAI.

11. That at all times relevant hereto, Defendant VADESA GUZMAN ("GUZMAN") was an employee of Defendant MOUNT SINAI, holding the position of "Financial Coordinator/Supervisor, Radiology Department."

12. That at all times relevant hereto, Defendant GUZMAN was Plaintiff GOREN's

2

supervisor and had supervisory authority over Plaintiff GOREN.

13.    That at all times relevant hereto, Defendant NISHA SULLIVAN ("SULLIVAN") was an employee of Defendant MOUNT SINAI, holding the position of "Administrative Manager, Radiology Department."

14.    That at all times relevant hereto, Defendant SULLIVAN was Plaintiff GOREN's supervisor and had supervisory authority over Plaintiff GOREN.

15.    That at all times relevant hereto, Defendant JOHN HART ("HART") was an employee of Defendant MOUNT SINAI, holding the position of "Administrative Director, Radiology Department."

16.    That at all times relevant hereto, Defendant HART was Plaintiff GOREN's supervisor and had supervisory authority over Plaintiff GOREN.

17.    That at all times relevant hereto, Defendant MOUNT SINAI, Defendant GUZMAN, Defendant SULLIVAN, and Defendant HART are collectively referred to herein as "Defendants."

## MATERIAL FACTS

18.    On or about July 27, 2009, Plaintiff GOREN began working for Defendants as a "Patient Coordinator" in Defendants' Radiology Department, located at 1176 5th Avenue New York, New York 10029, earning approximately $21.00 per hour.

19.    Throughout her tenure with Defendants, Plaintiff GOREN was an exemplary employee and always received compliments for her work performance. In fact, Plaintiff GOREN received many letters of commendation from numerous patients that she treated and helped as "Patient Coordinator."

20.    However, throughout her tenure, Plaintiff GOREN was also consistently and continuously

3

**sexually harassed and discriminated against solely due to Plaintiff GOREN's gender (female),** which created a hostile and intimidating work environment.

21.     Moreover, **Defendants then retaliated against, and terminated the employment of, Plaintiff GOREN,** solely for complaining about Defendants' sexual harassment and retaliation.

22.     By way of example, in or about August/September 2009, Plaintiff GOREN's direct supervisor, Ann Apanah, Administrative Manager of Radiology, told Plaintiff GOREN, "I can't believe a girl like you isn't pregnant, has a boyfriend or married.  It's a shame.  Your biological clock is ticking."  Plaintiff GOREN was extremely uncomfortable and offended by this blatantly unlawful comment.  While Plaintiff GOREN was hoping it was just a one-time occurrence, she was unfortunately wrong.

23.     Ann Apanah would also constantly make inappropriate comments to Plaintiff GOREN such as, "Thank you beautiful," "Beautiful, can you do this for me," and "Thank you gorgeous face."

24.     In fact, after Ann Apanah told Plaintiff GOREN, "I love you," and Plaintiff GOREN said that she was going to complain to Defendant SULLIVAN, Ann Apanah told Plaintiff GOREN, **"I am warning you, whatever you tell Nisha, it will get back to me."** Plaintiff GOREN was absolutely horrified and frightened to hear such a threat.

25.     Soon after, in or about October 2009, Ann Apanda told Plaintiff GOREN, "Nisha is a bitch.  She is jealous of you.  Don't trust her.  You can't give black people power.  They don't know how to act.  But you are different.  **You are attractive for a black girl.  Not all black people are attractive... like the nappy hair.  You don't look like most black people with big noses and big lips.  You have nice lips."**  By this time, Plaintiff

4

GOREN realized that Ann Apanah didn't see her as a regular employee and instead viewed her as a sexual object.

26.  In or about January 2010, Ann Apanah told Plaintiff GOREN, **"Don't knock being with a woman until you tried it."**

27.  Also in or about January 2010, referring to a coworker, Ann Apanah said to Plaintiff GOREN, **"Ooh, look at those boobs"** and proceeded to grab this female coworker's breasts. Even though Plaintiff GOREN always made it clear to Ann Apanah that she was not interested in anything more than a professional working relationship, Ms. Apanah never stopped making sexual advances towards Plaintiff GOREN, and in fact, began to make more overt sexual advances towards Plaintiff GOREN.

28.  For example, in or about January 2010, when Plaintiff GOREN was walking in the hallway, Ann Apanah put her arm around Plaintiff GOREN and asked her to come to her house for a cocktail. Not wanting to be accused of insubordination, Plaintiff GOREN politely declined these requests.

29.  In or about February/March 2010, Ann Apanah got breast implants and began to continually tell Plaintiff GOREN all about them including how they felt. Plaintiff GOREN was flabbergasted by Ms. Apanah's persistent sexual harassment.

30.  In fact, in or about March 2010, when Plaintiff GOREN and Ann Apanah were in the ladies' room, **Ann Apanah suddenly lifted up her top and asked Plaintiff GOREN if she wanted to touch her new breasts**. In response, Plaintiff GOREN said "no" and immediately exited the bathroom.

31.  Also in or about March 2010, Ann Apanah sent Plaintiff GOREN a **photograph of her new breasts**. Although Plaintiff GOREN was shocked and offended, she was

nonetheless still afraid to complain for fear of losing her job.

32.   In or about April 2010, Ann Apanah called Plaintiff GOREN into her office, told her to close the door, and then confided in Plaintiff GOREN that she wants to get tattoos in private places and **wants to get her clitoris pierced**.   Plaintiff GOREN was so embarrassed and felt so belittled by her supervisor's sexually harassing actions and remarks.

33.   In or about August 2010, in another attempt to seduce Plaintiff GOREN, Ann Apanah even offered to buy Plaintiff GOREN a faux Rolex watch.   While Plaintiff GOREN made it clear that she was physically repulsed and disgusted by the unrelenting sexual harassment, Ms. Apanah nonetheless continued with her behavior.

34.   Shockingly, when she realized that Plaintiff GOREN was never going to engage in sexual relations with her, in or about September 2010, Ann Apanah deliberately tossed Plaintiff GOREN's mug in the trash.   When Plaintiff GOREN went to Ms. Apanah's office to inquire about her mug, Ms. Apanah giggled and said, "Oh that was your mug, look in the trash.   You can still use it.   Just clean it."

35.   **As Plaintiff GOREN could no longer endure the continuous sexual harassment, on or about February 23, 2011, Plaintiff GOREN submitted a written complaint to Bernard Dumas, Defendants' Sr. Labor Relations Specialist, about Ann Apanah's sexual harassment.**   However, Mr. Dumas took absolutely no action in response to Plaintiff GOREN's complaint.

36.   In or about late-March 2011, when Plaintiff GOREN followed up with Mr. Dumas about her complaint, he said that he would get back to her but never did.

37.   As such, on or about April 5, 2011, Plaintiff GOREN submitted a second complaint to

6

Mr. Dumas regarding Ann Apanah's sexual harassment. Unfortunately, Mr. Dumas again wholly failed to address Plaintiff GOREN's complaints.

38.  Accordingly, **in or about early-May 2011, Plaintiff GOREN submitted another written complaint about Ann Apanah's sexual harassment to Salvatore LaVecchia, Defendants' Director of Labor Relations**, and on or about May 6, 2011, Plaintiff GOREN emailed him all of Ms. Apanah's sexually explicit text messages and photos.

39.  In or about late-May 2011, Defendants fortunately terminated Ann Apanah's employment. Although Plaintiff GOREN was hoping that the sexual harassment was finally going to end, she was horrified to discover that Defendants actually retaliated against her for complaining of the sexual harassment.

40.  In or about August 2011, Defendant GUZMAN became the new "Financial Coordinator/Supervisor," and thus became Plaintiff GOREN's new direct supervisor. Upon information and belief, Defendant GUZMAN and Ann Apanah are friends and used to work together at in Defendants' Radiology Department. As such, when Defendant GUZMAN became the new supervisor, she immediately started retaliating against Plaintiff GOREN by acting very cold towards, exhibiting animosity towards, and refusing to even talk to, Plaintiff GOREN.

41.  Furthermore, in or about September 2011, when Plaintiff GOREN arrived at work to cover a colleague's shift, Defendant GUZMAN informed Plaintiff GOREN that she was late. When Plaintiff GOREN apologized and explained to her how she got the time mixed up, Defendant GUZMAN was very dismissive, telling Plaintiff GOREN, "I am not going to entertain this conversation."

42.  Only one (1) hour later, Defendant GUZMAN randomly told Plaintiff GOREN, "If I say

something to you, I don't want to go back and forth.  I don't entertain conversations like that."   She then had the audacity to say, "You always have to have the last word." Plaintiff GOREN was shocked to hear this, as Defendant GUZMAN had only recently become Plaintiff GOREN's supervisor and it was the first time she had even spoken to Plaintiff GOREN.   Before Plaintiff GOREN was able to leave the room, Defendant GUZMAN told her, "You need to take a communication class," which Plaintiff GOREN found to be extremely insulting.

43.   On or about December 11, 2011, Plaintiff GOREN emailed Defendant SULLIVAN to ask for a transfer within the Radiology Department so that she no longer has to work under Defendant GUZMAN.  However, Defendant SULLIVAN never even replied to Plaintiff GOREN's email.

44.   On or about January 9, 2012, Defendant GUZMAN arbitrarily told Plaintiff GOREN that she couldn't wear her blue button down shirt and instead must wear her uniform sweater. However, only one (1) month earlier, Defendant GUZMAN suspiciously sent out an email in which she stated that the staff could wear blue shirts until they get new uniform tops.

45.   On or about April 5, 2012, after Plaintiff GOREN took two (2) paid days off, Defendant GUZMAN asked her about her ailment and then said, "Maybe you should consider doing another job... because you stand on your feet all day." Defendant GUZMAN was clearly trying to discourage Plaintiff GOREN from working in Defendants' Radiology Department.

46.   On or about May 6, 2012, Defendant GUZMAN again arbitrarily reprimanded Plaintiff GOREN for wearing a camisole under her white button down shirt.  However, Plaintiff

8

GOREN had witnessed a co-worker wearing a sheer coral blouse and a black tank top underneath, but Defendant GUZMAN said nothing to her, nor did she send her home.

47. As a result, **on or about May 15, 2012, Plaintiff GOREN met with Mr. LaVecchia during which she complained about all of Defendant GUZMAN's retaliation and also requested a transfer to another Department**.

48. On or about May 18, 2012, Plaintiff GOREN informed Defendant GUZMAN that due to a second job, she would be unable to attend the mandatory meeting scheduled on Saturday, June 16, 2012. However, on or about June 19, 2012, Defendant GUZMAN nonetheless issued Plaintiff GOREN a Warning for Insubordination for missing the meeting.

49. **On or about June 25, 2012, Plaintiff GOREN complained to Mr. LaVecchia about all of Defendant GUZMAN's continued retaliation.** More specifically, Plaintiff GOREN complained about her frivolous reprimands, nitpicking about her uniform, the fabricated warnings, and being passed over for a new position. Shockingly, in response, he said, "We solved the problem. Ann was fired." However, this was strange considering Plaintiff GOREN was complaining about Defendant GUZMAN's retaliation, not Ann Apanah's sexual harassment.

50. Also, beginning in or about June 2012, Raymond Berly, Defendants' Radiology Operations Manager, suddenly started to perform all of Plaintiff GOREN's job duties, including tracking patients and updating them on their wait time. In fact, Defendant GUZMAN told Plaintiff GOREN that she was no longer needed to cover the front desk because a new hire will be covering the front desk. Upon information and belief, **Mr. Berly also worked with Ann Apanda for many years, and accordingly was**

**participating in the retaliation by slowly removing all of Plaintiff GOREN's responsibilities**.

51.     On or about July 24, 2012, when Plaintiff GOREN asked Mr. Berly for help with an issue at the front desk, he just ignored her and kept chatting with an employee/patient. He then called her into his office, yelled at her, slammed his hands on his desk, shook his head, and said to Defendant GUZMAN, "She just doesn't get it," referring to Plaintiff GOREN.

52.     **As a result, on or about July 25, 2012, Plaintiff GOREN complained to Mr. LaVecchia about Mr. Berly's clear retaliation**.  In response, Mr. LaVecchia told Plaintiff GOREN to submit a grievance to Defendant GUZMAN regarding her own retaliation, which Plaintiff GOREN did.

53.     On or about August 3, 2012, Plaintiff GOREN met with Mr. Dumas to discuss her June 19, 2012 Warning, during which they told Plaintiff GOREN, "I don't care how many jobs you have on the weekend.  If Mount Sinai wants you to attend a mandatory meeting, you have to go."

54.     On or about August 17, 2012, not surprisingly, Defendant GUZMAN issued Plaintiff GOREN a Final Warning for lateness.  Defendants' plan to set Plaintiff GOREN up for termination was working because it got to the point where Plaintiff GOREN was having a hard time even getting out of bed in the morning due to the retaliation.

55.     On or about August 20, 2012, Plaintiff GOREN filed a Charge of Discrimination with the EEOC.

56.     On or about September 10, 2012, Defendant GUZMAN told Plaintiff GOREN, **"You are dressed unprofessional.  Your thighs are showing.  Your skirt needs to be longer. Above the knee or over the knee."**  However, Plaintiff GOREN had worn this skirt

numerous times before and it was never an issue.  Moreover, Defendant GUZMAN even wears skirts to work that are well above her knees.   Even worse, other employees, including Defendant SULLIVAN, wear skirts that are above the knee without any problems.

57.     On or about September 12, 2012, Plaintiff GOREN's doctor, Karen Sutton, diagnosed her with Post Traumatic Stress Disorder ("PTSD") and Depression and requested that she be excused "from work from 9/12/2012 to 9/18/2012."  As such, Plaintiff GOREN was out on medical leave until on or about September 19, 2012.

58.     On or about September 26, 2012, Plaintiff GOREN's legal adviser, Washington Davis, submitted a complaint of retaliation to Defendants' Labor Relations Department on behalf of Plaintiff GOREN.

59.     On or about October 5, 2012, in the presence of Defendant GUZMAN, Defendant SULLIVAN said to Plaintiff GOREN, "Melvina, you don't look happy here.  Secondly, you do not show Vadesa nor myself respect," to which Plaintiff GOREN responded, "Vadesa, when you became the new supervisor, I would say hello to you and you never said hello back. Nisha, I came to your office crying about Ann harassing me, and you did nothing about it. So, you want to talk about respect? No one has respected me."  When Defendant GUZMAN said that she was going to get Defendant HART, Plaintiff GOREN started to have a panic attack knowing that three (3) supervisors were going to retaliate against her.

60.     On or about October 8, 2012, Plaintiff GOREN's legal adviser, Washington Davis, submitted a second complaint of retaliation to Defendant SULLIVAN, Dr. Burton P. Drayer (Professor & Chairman of Radiology), and Defendants' Labor Relations

Department.

61.   Later that same day, Defendant GUZMAN retaliated against Plaintiff GOREN by telling her, **"Because of your legal adviser's letter, you are being relieved from duty pending a meeting and assessment with the Employee Assistant Program (EAP)."**

62.   On or about October 10, 2012, Plaintiff GOREN was examined by Myrla Van Sluytman Parrish, LMSW (Defendants' EAP Coordinator/Counselor), who told her, **"The hospital sees you as the problem. You are very naïve on how a business is run. Maybe the hospital job isn't for you. You should go back to retail.** Why do you stay if you aren't happy?"

63.   Plaintiff GOREN responded, "I just wanted a transfer. Several new people were hired in my department. I see new hires on a weekly basis for new employee orientation. I asked for a new opportunity months/over a year ago. I was offered no opportunity. I went to Labor Relations for help and a transfer and I keep getting the run around." Ms. Parrish said, "So, what does that tell you? There is a hiring freeze. **Also, Labor Relations is there to protect the hospital. You have to be evaluated by Mount Sinai referring Doctor.**"

64.   Accordingly, on or about October 15, 2012, Plaintiff GOREN was evaluated by Dr. Ira Bergman who gave her an additional three (3) weeks of medical leave, until on or about November 1, 2012.

65.   However, only one (1) week after Plaintiff GOREN returned, on or about November 9, 2012, Defendant SULLIVAN told Plaintiff GOREN, **"Your job is being phased out. We signed you up for Flowcast class and you are going to register. I am warning you, you will be tested after each class."** Plaintiff GOREN felt numb and just walked

away.  She then started calling out and showing up late because she began getting panic attacks whenever she saw Defendant SULLIVAN, Defendant GUZMAN, Defendant HART, Bernard Dumas, Salvatore LaVecchia, and Raymond Berly.

66.    On or about November 29, 2012, Defendant GUZMAN, Defendant SULLIVAN, and Defendant HART issued Plaintiff GOREN her Third Warning for absentees/unscheduled absences and lateness.

67.    At this point, Plaintiff GOREN started crying and shaking and said to Defendant GUZMAN, **"I am like this because of the sexual harassment and retaliation.** I still live with those memories every day. I hate coming to work. I had enough! I am being punished because I was the whistleblower. It's not right. How come you are always picking on me? You told me I couldn't wear my skirt anymore because it's not part of the uniform. I saw my co-worker wear a leopard top under her blazer. That isn't part of the uniform. If I came to work with that top, you would have sent me home immediately."

68.    Plaintiff GOREN turned to Defendant SULLIVAN and said, "I came crying to you about Ann sexually harassing me. You did nothing about it and actually ignored me for 2 weeks. Now you are giving me the registration job because my legal adviser sent a letter."

69.    Plaintiff GOREN next turned to Defendant HART and said, "I've been sexually harassed, bullied, berated, retaliated against, and told racist comments. As I was having my breakdown, they just watched me. They didn't offer me a tissue to wipe my face." Defendant HART's only response was, "Melvina, I am not a doctor, but you clearly look distraught. Take the remaining nine (9) weeks of your FMLA leave. When you come

back, if you're still not happy here, I suggest you find yourself another source of income."

70. As such, from on or about November 29, 2012 through on or about January 30, 2013, Plaintiff GOREN was out on medical leave pursuant to the Family and Medical Leave Act.

71. On or about February 15, 2013, Defendant GUZMAN, Defendant SULLIVAN, and Defendant HART summoned Plaintiff GOREN into a meeting, and suddenly terminated Plaintiff GOREN's employment due to "excessive absenteeism, unscheduled absences or lateness, failure to follow instructions or refusal to accept job assignment, and for a willful act or conduct detrimental to Medical Center operations."

72. Defendants' reason for the termination is clearly **pretextual**, as Plaintiff GOREN had only taken three (3) of her nineteen (19) allowed personal days in 2013, and was only fifteen (15) minutes late on February 7, 2013 and only one (1) minute late on February 8, 2013.  Moreover, the only reason that Plaintiff GOREN was ever absent from work or late to work was solely due the PTSD and Depression resulting from Defendants' constant retaliation.

73. It's clear that Defendants took advantage of the situation and the power they held over Plaintiff GOREN and obviously became very upset at Plaintiff GOREN for complaining about Ann Apanah's sexual harassment and getting her employment terminated.

74. **As such, on or about February 15, 2013, Defendants terminated Plaintiff GOREN's employment in retaliation for complaining about sexual harassment and retaliation.**

75. Plaintiff GOREN feels offended, disturbed, and humiliated by the blatantly unlawful and retaliatory termination.

76. The above are just some of the acts of sexual harassment, discrimination and retaliation

that Plaintiff GOREN experienced on a regular and continual basis while employed by Defendants.

77.  Defendants treated Plaintiff GOREN differently (sexually harassed) solely due to her gender (female).

78.  **But for the fact that Plaintiff GOREN complained about the sexual harassment, discrimination, and retaliation, Defendants would not have terminated her employment.**

79.  Defendants **had knowledge of and/or acquiesced in** the sexual harassment and retaliation, as Plaintiff GOREN complained on numerous occasions to Defendants, who rather than taking any action in response, instead turned around and terminated Plaintiff GOREN's employment.

80.  Defendants' actions were unsolicited, unwelcome and offensive.

81.  **Defendants' actions and conduct were intentional and intended to harm Plaintiff GOREN.**

82.  Plaintiff GOREN was regularly exposed to a sexually offensive and retaliatory hostile work environment by her supervisors.

83.  Plaintiff GOREN has been unlawfully discriminated against, sexually harassed, retaliated against, humiliated, degraded and belittled, and as a result, suffers loss of rights, emotional distress, loss of income, earnings and physical injury.

84.  Plaintiff GOREN's performance was, upon information and belief, above average during the course of her employment with Defendants.

85.  As a result of Defendants' actions, Plaintiff GOREN feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

86.   As a result of the Defendants' discriminatory and intolerable treatment of Plaintiff GOREN, Plaintiff GOREN has suffered severe emotional distress and physical ailments.

87.   As a result of the acts and conduct complained of herein, Plaintiff GOREN has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiff GOREN has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.   Plaintiff GOREN has further experienced severe emotional and physical distress.

88.   As a result of the above, Plaintiff GOREN has been damaged in an amount which exceeds the jurisdiction limits of the Court.

89.   Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.  As such, Plaintiff GOREN demands Punitive Damages as against all Defendants, jointly and severally.

**AS A FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER TITLE VII**
**(Not Against Individual Defendants)**

90.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

91.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendants.   Plaintiff complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender (sexual harassment).

92.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et

16

seq., by discriminating against Plaintiff because of her gender (sexual harassment).

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
### (Not Against Individual Defendants)

93.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

94.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides

that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate

against any of his employees . . . because he has opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge, testified,

assisted or participated in any manner in an investigation, proceeding, or hearing under

this subchapter."

95.     Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et

seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges

of employment because of her opposition to the unlawful employment practices of

Defendants.

## AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

96.     Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

97.     The New York City Administrative Code §8-107(1) provides that, "It shall be an

unlawful discriminatory practice: (a) For an employer or an employee or agent thereof,

because of the actual or perceived age, race, creed, color, national origin, gender,

disability, marital status, sexual orientation or alienage or citizenship status of any person,

to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

98.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her gender (sexual harassment).

## AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

99.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

100.    The New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

101.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

102.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

103.    The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate

against any person because such person has opposed any practices forbidden under this chapter. . ."

104.  Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(7) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

105.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

106.  New York City Administrative Code §8-107(19) Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

107.  Defendants violated the section cited herein as set forth.

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

108.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

109.  New York City Administrative Code §8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

   a.  An employer shall be liable for an unlawful discriminatory practice based upon

19

the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

    1.   the employee or agent exercised managerial or supervisory responsibility; or

    2.   the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

    3.   the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

110.    Defendants violated the section cited herein as set forth.

## JURY DEMAND

111.   Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et. seq.*, and the New York City Administrative Code, §8-107 *et. seq.*, in that Defendants sexually harassed Plaintiff, discriminated against Plaintiff on the basis of her gender, and retaliated against Plaintiff for objecting to, and complaining about, Defendants' sexual harassment and retaliation;

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful sexual harassment, discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
   April 2, 2013

             **PHILLIPS & ASSOCIATES,**
             **ATTORNEYS AT LAW, PLLC**

     By:    _____
             Alex Umansky, Esq. (AU7961)
             *Attorneys for Plaintiff*
             30 Broad Street, 35th Floor
             New York, New York 10004
             (212) 248-7431
             aumansky@tpglaws.com